**Thomas K. GILHOOL et al.**

v.

**CHAIRMAN AND COMMISSIONERS, PHILADELPHIA COUNTY BOARD OF ELECTIONS et al.**

Civ. A. No. 69–2139.

United States District Court
E. D. Pennsylvania.

Oct. 14, 1969.

Judgment Affirmed March 2, 1970.
See 90 S.Ct. 996.

———◆———

Paul Bender, Donald Joseph, Philadelphia, Pa., for plaintiffs.

Levy Anderson, Deputy City Solicitor, Philadelphia, Pa., for the Philadelphia County Board of Elections.

William Sennett, Atty. Gen., Harrisburg, Pa., for the Commonwealth of Pennsylvania.

I. Packel, Philadelphia, Pa., for the Democratic City Committee.

Edward R. Becker, Philadelphia, Pa., for the Republican City Committee.

Before KALODNER, Circuit Judge, and HIGGINBOTHAM and MASTERSON, District Judges.

## OPINION OF THE COURT

MASTERSON, District Judge.

Plaintiffs brought this action to enjoin the City of Philadelphia "from preparing or utilizing voting machines or ballots employing straight party voting levers for the offices of Councilman in the First and Seventh Councilmanic Districts in the special elections to be held in those Districts in Philadelphia on November 4, 1969, or from conducting the election in any other manner causing discrimination against independent candidates for Councilman, their supporters, or electors wishing to vote for such candidates."

The plaintiffs are residents and electors of the First and Seventh Councilmanic Districts of the City of Philadelphia. The purpose of the special election in question is to fill vacancies which have occurred in the office of councilman in these districts. Pursuant to writs of election issued on September 5, 1969, by the President of City Council, the special elections are scheduled to be held in conjunction with the regular municipal election on November 4, 1969.

■ In their complaint, the plaintiffs requested the convening of a district court of three judges on the ground that the injunctive relief sought would restrain the enforcement, operation and execution of state statutes of state-wide application, namely, the Election Code of the Commonwealth of Pennsylvania, as amended, 25 Purdon's Pa.Stat.Annot. §§ 2787 and 3010(h).[1] Pursuant to 28 U.

---

1. Section 2787 provides:

Every special election, held under the provisions of this article, shall be held and conducted in all respects in accordance with provisions of this act relating to November elections, and the provisions of this act relating to November elections shall apply thereto in so far as applicable, and not inconsistent with any other provisions of this act. All such special elections held at the time of a regular primary or November election shall be conducted by the election officers by the use of the same equipment and facilities, so far as practicable, as are used for such primary or November election.

Section 3010(h) provides:

The names of all candidates of a political party shall appear in the same row

S.C. § 2281,[2] a three judge court was convened and a hearing was scheduled for September 24, 1969. Prior to the hearing, motions to intervene as party-defendants were made by the Philadelphia County Democratic Executive Committee and the Republican City Committee and the motions were granted by the Court.[3]

At the initial hearing, the plaintiffs' complaint was three-pronged: (1) they averred that the use of a straight party lever, which permits a voter to vote for all the candidates of a party by turning a single large lever above the column in which the party's candidate appears, unconstitutionally favors the major parties and results in a discrimination against

or column, and no other names shall appear in the same row or column, to the left or top of which shall be a straight party lever, by means of which an elector may, in one operation, vote for all the candidates of that political party for every office to be voted for. The names of such candidates shall be arranged under or opposite the title of the office for which they are candidates, and shall appear in the order of the votes obtained by the candidate for Governor of the party nominated at the last gubernatorial election, beginning with the party obtaining the highest number of votes: Provided, however, That in the case of parties or bodies not represented on the ballot at the last gubernatorial election, the names of the candidates of such parties shall be arranged alphabetically, according to the party or body name. The names of all candidates of a political body shall appear in the same row or column, and, if the number of parties and bodies permits, each political body shall be entitled exclusively to a separate row or column, with a straight party lever. If, however, the number of political parties and political bodies renders it impossible or impracticable to so arrange the political bodies, in such case said bodies shall not be entitled to a separate row or column and a straight party lever, but shall be listed by political appellations on the first left hand or top row, with the designating letter and number of the ballot label where their candidates may be found, together with the political appellations of other political bodies, whose candidates may be interspersed on the same row or column. Subject to the aforesaid limitations, the form and arrangement of ballot labels, as to the placing thereon of political bodies, shall be within the discretion of the county board.

2. For section 2281 to be applicable, the following requirements must be fulfilled: (1) a state statute must be challenged; (2) a state officer or local officer performing a state function must be a party defendant;

(3) injunctive relief must be sought; (4) it must be claimed that the statute is contrary to the Constitution.

There is no problem in this case with requirements (1), (3) and (4). The Pennsylvania Election Code is a state statute of statewide application and the plaintiffs are seeking injunctive relief, claiming that certain Election Code provisions are violative of the First and Fourteenth Amendments to the Federal Constitution. The problem is with the second requirement—that the parties-defendant be state or local officers performing a state function.

The named defendants here are the Philadelphia County Board of Elections and its Chairman and Commissioners. The Board is established pursuant to state law (25 Purdon's Statutes § 2641) and its powers and duties are defined by state law (25 Purdon's Statutes § 2642). It is clear under the decided cases that, whether these officials be denominated as state or local officers, the crucial issue for the purpose of deciding whether a three judge court should be convened is whether these officials are performing a local or state function in carrying out the actions which the plaintiffs seek to enjoin. See, e. g., Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1945); Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935). Since plaintiffs are here attacking the use of a straight party lever which is required to be used pursuant to the State Election Code, and since the ballot for November 4th includes elections for both statewide and local offices, we have concluded that the defendants are performing a state function when they place a straight party lever on the voting machines. Hence, they are state officers within the meaning of 28 U.S.C. § 2281.

3. Pursuant to 28 U.S.C. § 2284, the Governor and Attorney General of the Commonwealth of Pennsylvania were given adequate notice of the hearing and, in fact, were represented at the hearing.

candidates of other political parties and bodies; (2) plaintiffs also contended that the physical layout of the ballot allegedly proposed for the special election in the First Councilmanic District discriminated against the so-called independent candidates since all the independent candidates' names were arranged vertically on the far right side of the ballot, whereas the major parties' candidates for the same office would appear horizontally on the left of the ballot;[4] (3) plaintiffs further complained that the instructions to the voters appearing at the bottom of the ballot in recent elections,[5] and presumabably these same instructions would be employed in this election, were misleading since they appeared to state that the voter would have to vote a straight party ticket before he could "split" his vote for candidates of other parties.

At the conclusion of the first hearing, it was readily apparent that this Court could not decide the issues presented because the facts were in an unsettled state. More specifically, the defendants advised the Court that the physical layout of the ballot would not be finally determined until the state courts ruled on challenges lodged against parties which had filed for ballot position in the First Councilmanic District for the November 4th election. The outcome of these challenges would be the controlling factor as to whether all the political parties would have their own vertical columns on the

ballot so as to allow candidates for a particular office to appear on the same horizontal plane across the ballot. The defendants also agreed to have the plaintiffs participate in the drafting of new voter instructions with the intention that the new instructions would be acceptable to all. In light of these developments, the initial hearing was adjourned until such time as the final format of the ballot could be determined.

On October 6, 1969, another hearing was held. At this time, the defendants stated to the Court that of the 11 political parties and bodies that had filed for ballot position in the First Councilmanic District the state courts had sustained objections to three of the bodies and that the County Board of Elections had rejected the nominating papers of a fourth body. Consequently, only 7 political parties and bodies remain on the ballot in the First Councilmanic District. The defendants also stated that the 9-column voting machines will be used in this District, thus providing each party and body with their own vertical column and party lever and allowing all candidates for a particular office to appear on the same horizontal plane on the face of the ballot. Similar arrangements are planned for the Seventh Councilmanic District where we have been told that not more than eight political parties and bodies will appear on the ballot. However, these procedures did not satisfy the plaintiffs who reiter-

---

4. The question whether all the political parties and bodies could be provided with separate vertical columns on the ballot resolved itself into one of physical possibility, for the City of Philadelphia only had voting machines which could accommodate up to nine columns. This did not present a problem in the Seventh Councilmanic District where only nine political parties or bodies had filed for ballot position. However, in the First Councilmanic District, 11 parties or bodies had filed for the election and, if all went unchallenged, it could occasion the type of ballot layout of which the plaintiffs complain.

5. These instructions, in pertinent part, appeared as follows on the face of the ballot:

INSTRUCTIONS TO VOTER

FIRST OPERATION—Turn Voting Switch to Right which will Close Curtain and will Unlock Machine so you can vote.

SECOND OPERATION—TO VOTE A STRAIGHT PARTY TICKET.—Turn large lever at top of Party Column until X marks appear to the right of the names of all Candidates.

THIRD OPERATION—TO VOTE A SPLIT TICKET.—After turning down Party Lever, turn up Lever opposite the Candidate's name you wish to cut out. Then turn down Lever to the right of the name of any Candidate for the SAME OFFICE.

\*     \*     \*     \*     \*

ated their objections to the presence of straight party levers, irrespective of the fact that these levers were now provided for all the political parties and bodies. The plaintiffs also complained that the "spatial gaps" which appeared on the ballot discriminated against their candidates. These "gaps" are the result of the failure of two parties (whose columns separate the two major parties on the left of the ballot from the independent bodies on the right of the ballot) to run candidates for the office of Councilman in the First District.

At the October 6th hearing, the defendants also presented to the Court the revised voting instructions [6] which would appear on the ballots. These also were objected to by the plaintiffs who contended that it would be more logical to have the instruction for "splitting" a ticket come before the instruction which explains how to vote a straight party ticket.

■ Plaintiffs contend that notwithstanding the apparent equality of treatment on the face of the ballot, in that all parties and bodies now have their own vertical columns and party levers, the mere presence of party levers will cause voters who would otherwise vote for independent candidates to "shift" their votes to candidates of the major political parties. However, we find that the plaintiffs have failed to meet their burden of proof in this regard as no testimony was adduced to show that, where all parties and bodies had a straight party lever above their respective columns on the ballot, one desiring to vote for any of the independent candidates would in some way be deterred from so doing by the mere existence of a party lever appearing at the head of the Republican and Democratic columns.[7]

■ In the absence of such evidence, plaintiffs have urged the court to take judicial notice of several studies of voter habits which they contend support their theory that the use of a party lever causes a "voter shift".[8] This court has

6. In pertinent part, these instructions will appear on the November 4, 1969 ballots as follows:

INSTRUCTIONS TO VOTER
1. Turn Voting Switch to Right which will Close Curtain and will Unlock the Machine for voting.
2. TO VOTE
a) You may vote a straight party ticket by pulling down and to the left, the large lever at the top of the Party Column until X marks appear to the right of the names of all Candidates of that party.
OR
b) You may vote a split ticket either by turning down the small individual levers to the right of each candidate for whom you wish to vote until an X mark appears to the right of the name of each candidate.
OR
You may turn down a party lever, then turn up the lever of candidate or candidates of that party for whom you do not wish to vote, and then turn down the lever of any other candidate FOR THE SAME OFFICE for whom you do wish to vote.
OR
c) To vote for a person whose name does not appear upon the ballot labels, release lever at the extreme left hand side of the machine, pull out slide of the office for which you wish to vote, and write in name of person of your choice.
\* \* \* \* \*

7. Neither of the plaintiffs' witnesses presented any evidence, statistical or otherwise, of such "a shift". Plaintiffs' witness Cooper was not familiar with any study comparing voting patterns in elections where party levers were used to those elections where they were not used. (N.T. p. 54). He speculated that in his opinion the party levers would result in the regular party candidates getting more votes than they would get if party levers were not used, since many voters who might have difficulty with the voting machines would take the line of least resistance and pull down the party lever of their own party. (N.T. pp. 57–59). Cooper's testimony was entirely unsupported by reference to any persuasive data and is entitled to very little weight. In any event, it does not support the plaintiffs' theory of a "voter shift".

8. See Walker, Ballot Forms and Voter Fatigue: An Analysis of Office Block and Party Column Ballots in 10 Midwest Journal of Political Science 448 (1966) ; Campbell & Miller, The Motiva-

concluded that these studies are not properly before the court since they have not been identified by any witnesses as standard reference works and none of the experts who testified commented as to these specific studies either as to the authors' methodology or the accuracy of their results. In addition to this technical objection, however, a reading of the studies reveals that they simply do not support plaintiffs' claim. First, none of the studies were directed to the question of whether or not, in an election such as the one before the court, the mere presence of the party lever in and of itself would cause voters to shift their votes from independent candidates to the candidates of a major party. On this critical question, the studies are entirely silent. Secondly, the only tangible fact reported by these studies appears to be that, in the elections studied, candidates appearing below the top of the tickets tend to get more votes in states where party levers are used than they do in states where party levers are not used. The authors offer various hypotheses to explain this phenomenon, including voter confusion, voter fatigue, disinterest in the lower offices appearing on the ballot and a tendency to use the line of least resistance and vote for party affiliation when that can be done easily. None of the studies suggest that the well-informed, motivated voter would be in any way affected by the presence of the party levers. They also tend to indicate that the removal of the party lever would discriminate against poorly educated voters by depriving them of an opportunity to vote for the candidates of their political party in a convenient way.[9]

In the case at bar, a voter wishing to vote for an independent candidate for City Council has just as many ways of voting for that candidate as he has for voting for a candidate of one of the regular political parties. He can turn either the large party lever at the top of the column in which the candidate's name appears or he can use the smaller lever opposite the candidate's name. Hence it will not be substantially more difficult, as plaintiffs claim, to vote for an independent candidate for City Council than for a candidate of one of the regular political parties. Accordingly, this court has concluded that the plaintiffs have failed to sustain their burden of proving that the use of party levers in this election attains the dimension of an "invidious discrimination" proscribed by the Federal Constitution.

The Election Code of Pennsylvania makes it mandatory to have party levers on voting machines. It is set out at 25 Purdon's Pa.Stat. § 3007 that:

> "No voting machine shall * * * be approved by the Secretary of the Commonwealth * * * unless it shall, at the time, satisfy the following requirements:
>
> * * * * * *
>
> (b) It shall permit each voter, at other than primary elections, to vote a straight political party ticket in one operation * * * to vote for all the candidates of one political party for every office to be voted for, except those offices as to which he votes for individual candidates.
>
> (c) It shall permit each voter, at other than primary elections, to vote a ticket selected from the nominees of any and all political parties, from the nominees of any and all political bodies, and from persons not in nomination."

See Leon v. Philadelphia, 9 Pa.Dist. & Co.R.2d 706 (1956); Petition To Set Aside Special Election in the 32nd Senatorial District, 15 Pa.Dist. & Co.R.2d 271 (1956).

tional Basis of Straight and Split Ticket Voting in 51 American Political Science Review 292 (1957); Campbell, Converse, Miller & Stokes, The American Voter (1960).

9. See Walker, 450, 462.

The constitutionality of a single party lever was considered by a three judge court in the case of Voorhees v. Dempsey, 231 F.Supp. 975 (D.Conn.1964), aff'd 379 U.S. 648, 85 S.Ct. 612, 13 L. Ed.2d 552. That case involved a Connecticut mandatory party lever statute where the machines were arranged so that it was necessary to pull a party lever to unlock the machine in order to vote. In holding that the statute did not deprive independent voters of any constitutional right, the Court said:

"The mandatory party lever statute does not deny any candidate a place on the ballot, nor does it prevent any voter from voting for any candidate. A vote for a straight ticket is accorded no greater weight in the final tallies than a vote for a split ticket. While the wisdom of the mandatory party lever statute may be questionable, it can hardly be termed fundamentally unfair or unreasonably discriminatory in contravention of the Fourteenth Amendment. Indeed, the disadvantaging inconvenience to split ticket voters from the Connecticut statute would appear to be much less than the New Jersey statutes, sustained by a three judge court in Voltaggio v. Caputo, 210 F.Supp. 337 (D.C.N.J.), app'l dismissed, 371 U.S. 232, 83 S.Ct. 325, 9 L.Ed.2d 494 (1962), denying an independent candidate the opportunity to have his name listed on the ballot with the top group of candidates. * * * The utilization of party levers, be they optional or mandatory, discriminates against the independent voter to the extent the latter must spend more time and effort to vote for the same number of candidates than one who votes for a straight ticket. However, there is a rational basis for this discrimination, for the party lever simplifies and speeds up the voting process for large numbers of voters. * * * We are unable to see that the slight extra effort required for an independent voter to pull a party lever and reject candidates for whom he does not care to vote constitutes such a burdensome and unreasonable discrimination that the independent voter is deprived of the equal protection of the laws.

In the case at bar, there is even less disadvantage to the independent candidates than there was in the *Voorhees* case since any voter desiring to vote for such a candidate can do so by either turning the party lever at the head of the column in which the candidate's name appears or by pulling the lever which is next to his name.

Plaintiffs urge that the Supreme Court's affirmance of the *Voorhees* result should be ignored because it has been "undermined" by Williams v. Rhodes, 393 U.S. 213, 89 S.Ct. 5, 21 L. Ed.2d 24, and Moore v. Ogilvie, 394 U.S. 814, 818, 89 S.Ct. 1493, 23 L.Ed.2d 1. We do not read those cases as undermining the result in *Voorhees*. In *Williams*, the court found that Ohio's election laws were so laced with restrictions as to make it virtually impossible for any party to qualify on the ballot except the Democratic and Republican parties. In *Moore*, the court voided an Illinois statute which made it impossible for the voters in 49 counties, representing 93.- 4% of the registered voters in the state, to form a new political party and place its candidates on the ballot. Both decisions rested on the principle that election laws which make it difficult or impossible for independent parties or candidates to be placed on the ballot violate the Equal Protection Clause of the Federal Constitution because they have the effect of denying the franchise to many of the citizens of the states involved. There is no such problem here. All of the candidates who desire to be on the ballot are on the ballot, and there is no mechanical advantage given to any of the parties or candidates. Hence plaintiffs' reliance on *Williams* and *Moore* is misplaced.

Plaintiffs' second contention is that the "gap" between the Republican and Democratic columns on the left of the ballot (Columns A and B) and Columns

E, F, and G on the right of the ballot (Mr. Gilhool appears in Column G) unconstitutionally discriminates against the candidates in Columns E, F, and G (see the Appendix). The basis for plaintiffs' contention is a theory known as the "law of proximity". There was expert testimony at the first hearing that the separation between the major party candidates, listed horizontally and in separate columns on the left of the ballot, and the independent candidates, listed vertically in one column on the right, on the visual field of the ballot, could deceive the voter into believing that the two groups were different and that the only candidates for the councilmanic election were the major party candidates on the left. This, it is said, will cause the independent candidates to lose votes, even if a voter originally intended to vote for an independent candidate when he entered the voting booth. The testimony of the expert was addressed to the original layout of the ballot, which, as we now know, will not be used in the November 4th election. Notwithstanding the change in the set up of the ballot, however, plaintiffs urged at the second hearing that the "law of proximity" still applied, and that although the effect of the alleged prejudicial positioning of the columns inuring from the operation of the "law of proximity" had been materially diminished by the new ballot layout, it had not been eliminated.

■ We find that the plaintiffs have also failed to sustain their burden of proof on this issue. Even if this "spatial gap" discriminates against independent candidates, there is no evidence as to the extent and magnitude of the alleged discrimination. The "gap" exists because the Constitutional Party in Column C and the American Independent Party in Column D have failed to run candidates for any office. Under the Pennsylvania Election Code (25 Purdon's Statutes § 2963), these two parties have a right to be on the ballot and voters may write in candidates in their col-umns. They are positioned between the party candidates and the independent candidates pursuant to the Pennsylvania Election Code and not at the whim of the Board of Elections. Under Section 3010(h) of the Election Code, the order of the parties from left to right on the ballot is dictated by the number of votes received by a party's candidate in the last gubernatorial election. The party whose candidate received the largest number of votes in that election is placed in Column A on the extreme left, the party receiving the next highest total is placed in Column B and so forth. If a party was not represented in that election, then it is listed alphabetically after those which were represented, beginning with the next available column on the left of the ballot and working towards the right. This statute reasonably and fairly arranges the parties on the ballot and cannot be considered unconstitutional merely because of the coincidence that two parties have not run any candidates.

■ Lastly, plaintiffs attack the voting instructions claiming that they favor straight party voting to the prejudice of independent candidates. The original instructions have been changed and most, if not all, of the alleged bias has been overcome by the new instructions (See footnotes 5 and 6, supra). It has now been made clear to the voter that he need not first pull a party lever before "splitting" his vote among other candidates. Hence, the instructions neither unjustifiably encourage voters to use straight party levers nor do they tend to confuse or dissuade voters from voting for independent candidates.

In view of our holding that plaintiffs' proofs with respect to the conduct of defendants in the scheduled Special Election to fill vacancies in the offices of Councilman in the First and Seventh Councilmanic Districts in the City of Philadelphia, Pennsylvania, have failed to establish that such conduct attains the dimension of "invidious discrimination" proscribed by the Federal Consti-

tution, the Complaint is dismissed and an Order dismissing the Complaint will be entered.

What we have said above constitutes our Findings of Fact and Conclusions of Law.

D-5
P75
10.9.69

1ST
COUNCILMANIC DISTRICT

## VOTING MACHINE SAMPLE BALLOT
### GENERAL MUNICIPAL AND SPECIAL ELECTION, TUESDAY, NOVEMBER 4, 1969

38th WARD
Election District

Voting machine sample ballot table with columns: Personal Choice, Republican Column A, Democratic Column B, Constitutional Column C, American Independent Column D, Consumers Column E, Black Panther Column F, Urban Action Column G, Column H, Questions, Questions.

### INSTRUCTIONS TO VOTER

1. Turn Voting Switch to Right which will Close Curtain and will Unlock the Machine for voting.
2. TO VOTE
   a) You may vote a straight party ticket by pulling down and to the left, the large lever at the top of the Party Column until [X] marks appear to the right of the names of all Candidates of that party.
   b) You may vote a split ticket either by turning down the small individual levers to the right of each candidate for whom you wish to vote until an [X] mark appears to the right of the name of each candidate.
   OR
   You may turn down a party lever, then turn up the lever of candidate or candidates of that party for whom you do not wish to vote, and then turn down the lever of any other candidate FOR THE SAME OFFICE for whom you do wish to vote.
   OR
   c) To vote for a person whose name does not appear upon the ballot labels, release lever at the extreme left hand side of the machine, pull out slide of the office for which you wish to vote, and write in name of person of your choice.
3. At the extreme right of the machine there are LOAN QUESTIONS and JUDICIAL RETENTION of Judges. Turn small lever to left until [X] appears.
   LOAN QUESTIONS. YES Indicates a vote FOR the Loan Question. NO Indicates a vote AGAINST the Loan Question.
   JUDICIAL RETENTION. YES Indicates a vote to RETAIN the Judge in office. NO Indicates a vote AGAINST the retention of the Judge in office.
4. Leave the small levers down for all persons for whom you wish to vote.
   REMEMBER: No votes are registered until the voting switch is turned to the left to open the curtain. Therefore, as long as the curtain is closed around you, you may change your vote as many times as you desire by simply turning up the lever of the candidate for whom you do not wish to vote and turning down the lever of the candidate for the same office for whom you do wish to vote. The machine will not allow you to vote for more than the proper number of candidates for each office.
5. Turn Voting Switch to Left which will cancel your vote, clear machine and return left wing open.

### POLLING PLACE OPEN FROM 7 A.M. TO 8 P.M.

[A 378]