Marilyn GROFF, individually and on behalf of her minor child, Ruth Groff, and Florence Emerson, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Helene WOHLGEMUTH, individually and as Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania, and Clarence P. Jenkins, individually and as Executive Director of the Philadelphia County Board of Assistance, Defendants.

Civ. A. No. 70–3340.

United States District Court,
E. D. Pennsylvania.

June 22, 1971.

Jonathan M. Stein, Douglas G. Dye, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

J. Shane Creamer, Atty. Gen., Marx Leopold and Jacques H. Fox, Asst. Attys. Gen., Harrisburg, Pa., for defendants.

Before KALODNER, Circuit Judge, and BECKER and HUYETT, District Judges.

OPINION AND ORDER

EDWARD R. BECKER, District Judge.

I. PRELIMINARY STATEMENT.

We are called upon to measure against the equal protection clause of the Four-

teenth Amendment, regulations of the Pennsylvania Department of Public Welfare which determine allowances for shelter and utilities to recipients of public assistance.[1] A three-judge court has been convened because the case involves a federal constitutional attack upon welfare regulations of statewide applicability.[2] The case arises upon the complaint of two welfare recipients who assert that the shelter and utilities regulations are invidiously discriminatory against a class composed of: (1) tenants who make payment for utilities' service directly, instead of making a lump sum payment to their landlord covering utilities and rent; and (2) homeowners who naturally pay their own utility bills.

Plaintiff Groff was a tenant. Plaintiff Emerson is a homeowner. By the time of trial, Mrs. Groff was apparently no longer on the assistance rolls, and counsel for plaintiffs could not find her. However, the bulk of the facts affecting Mrs. Groff had already been stipulated to and incorporated in the Court's pretrial order; moreover, facts affecting a tenant's claim were adduced at the trial. The state Attorney General has not asked us to dismiss the Groff claim as moot or to refrain from consideration of it. Counsel for the plaintiffs, citing to us the rule that questions of public importance "capable of repetition yet evading review" are not readily mooted,[3] have asked us to consider the Groff claim. Neither side has requested that we amend our class action determination, made pursuant to agreement of counsel.

In view of the foregoing, as well as our analysis of the case and of the disposition we make, we will consider both the tenant (Groff) and the homeowner (Emerson) claims.

## II. A DISCUSSION OF THE REGULATIONS UNDER ATTACK AND OF THE CONCEPT OF A WELFARE "STANDARD".

The Pennsylvania Manual ("Manual") lists five "common items" as being needed by all welfare recipients. These items are food, clothing, incidentals, utilities and shelter.

The *shelter allowance as* defined in the Manual is the actual monthly cost, depending on the kind of living arrangement the welfare client has, for certain component items. In the case of a tenant, the items consist of the actual rental payment plus small additional sums for water, sewerage and garbage and refuse disposal. In the case of a homeowner, the sums included are mortgage interest and amortization payments, property taxes, house insurance, major repairs or replacements, and small sums for water, sewerage, garbage disposal and minor upkeep and repairs. The regulations set forth a maximum shelter allowance, which provides a ceiling, stated in dollar terms, regardless of the actual monthly cost to the welfare client.[4]

The *utilities allowance,* on the other hand, is not stated by the Manual in terms of actual cost, but in terms of a fixed monthly dollar allowance for utilities, depending upon the number in the family unit. In welfare parlance, this type of allowance is known as a "standard". Food, clothing and incidentals are also stated in the Manual in terms of a standard.

---

1. The Pennsylvania Department of Welfare regulations are compiled in a book known as the "Pennsylvania Manual".

2. The three-judge court was requested by the Attorney General of Pennsylvania, who affirmed that the regulations under attack accurately reflect state policy. In Pennsylvania, the "State Plan" (see 42 U.S.C. § 602) consists principally of the Department of Public Welfare regulations, since the Pennsylvania Welfare

Statute is extremely general and delegates to the Welfare Department the formulation of standards as to eligibility for assistance and the nature and extent thereof. Pa.Stat. tit. 62, § 401 et seq.

3. Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

4. There are various schedules for the different areas of the state.

According to the testimony, a "standard" is a formula for measuring the component elements of a particular assistance category. It results from an analytical study of the component elements measured against economic and physical conditions prevailing in various parts of the state.[5] The standard is "costed out" for the region in question, and the figure thus arrived at is the assistance allowance for the item in question. The standards are submitted to and approved by the Department of Health, Education and Welfare from time to time and are also re-evaluated cost-wise on a periodic basis. That a standard may not approximate to actual costs in a given case is plain, in view of the wide variance in life styles among individuals. However, the very concept of a standard is that it is *intended* to approximate actual cost in a given case per assistance recipient because the standard is costed out at 90 to 100% of today's costs, subject to some variation because of the level of legislative appropriations.

The testimony further established that the reason that shelter is set forth in terms of actual cost rather than in terms of a standard is that there is a wide variation in housing costs in different areas of the state, and, in fact, even within different areas of the same county. Hence, it is impossible to develop a standard for shelter. In this respect, therefore, shelter is unique in the allow-ance scheme. While under the fundamental structure of the Manual, a welfare recipient receives his actual shelter cost as the shelter allowance, and receives the amount of the applicable utility standard, there is an exception to this scheme. It is found in the following section, from which the issues raised in this case emanate:

3211.2 Utilities

"a. If payment for all utilities is included in the payment for shelter, the U[utilities] allowance is combined with the shelter allowance and the sum is the maximum allowance for shelter and utilities." [6]

## III. PLAINTIFFS' EVIDENCE AND THEIR THEORY OF INVIDIOUS DISCRIMINATION.

It is plain that, under the regulations just recited, where rental paid by a tenant to a landlord includes payment for provision of utilities by the landlord, the housing allowance provided by the Department is the actual cost of the rental payment up to the combined maxima of the shelter and utilities allowances. However, where a tenant pays his utilities costs separately from his rental, the department does not combine the two payments; it pays only the actual cost for each up to the separate maxima. Hence, in this latter situation where: (1) the utilities cost exceeds the utilities

---

5. The testimony with respect to "standards" came from Debra Davis, Director of the Bureau of Assistance Policies and Standards with the Pennsylvania Department of Public Welfare. Miss Davis has been associated with the Department of Public Welfare since its inception in 1937. The utilities standard, for instance, takes into account the amount of space required by an individual, the amount of fuel required to heat that space, the necessary amount of cooking fuel and lighting fuel, the various heat zones within the state, etc.

6. There is an identical subsection under the heading "Shelter":
3211.3 *Shelter*
"In any case when the payment for shelter includes all of the utilities,

the allowance for shelter is the actual payment subject to the sum of the maximum allowance for shelter plus the allowance for utilities." (3211.2 and 3211.3 are coordinate subsections.

The regulations also provide:
3211.3 *Shelter*
"In any case when the payment for shelter includes one or more of the utilities but not all of them, the allowance is the actual payment subject to the maximum allowance for utilities, see 3252.1."
The reasoning of this opinion applies equally to the claim of plaintiffs based upon this latter section, and it will not be discussed further.

allowance, but (2) the actual shelter expense is *below* the maximum shelter allowance, then the allowance provided by the Department (which is an amount equal to actual shelter cost plus the utilities allowance) does not provide the full amount of the recipient's total shelter and utilities costs. The same situation prevails with respect to a homeowner who, naturally, pays his own utility bills.

Plaintiffs' complaint attacks the refusal of the Department to allow, in these latter two examples, shelter "savings", *i. e.*, the extent to which actual shelter costs are less than the shelter maximum—to be applied to excess utilities costs, even though the recipient's total "housing costs" (this is the phrase plaintiffs use to describe shelter and utilities) are *at or below* the combined shelter and utilities allowance maxima. The claim of invidious discrimination in violation of the equal protection clause stems from plaintiffs' contention that it is unreasonable, irrational and arbitrary to extend different treatment to a relief recipient who fortuitously (and for reasons generally beyond his control) pays for shelter and utilities separately from one who pays for some or all of them together.

Plaintiffs' evidence is intended to demonstrate how the discrimination works in action:

1. *The Groff Case.* Mrs. Groff is a tenant who pays her rental and utilities separately. She pays only $27.50 per month for rental, far below the $69.00 maximum shelter allowance for a family of two. Mrs. Groff's electric and gas utility costs, however, average $60.00 per month, far in excess of the $19.00 per month departmental allowance for a family of two persons. As we have said, plaintiffs' counsel have constructed the concept of "housing costs", which consists of the combination of shelter and utilities. Having demonstrated that Mrs. Groff's monthly assistance allowance for "housing costs" is $46.50 ($27.50 for rent and $19.00 for utilities), whereas her actual "housing costs" are $87.50 per month, they argue that she is denied

equal protection of law, vis-a-vis a tenant who pays shelter and utilities together to the landlord, and, who is, pursuant to the above cited regulation, entitled to receive the combined housing and utilities maxima of $88.00 ($69.00 plus $19.00).

2. *The Emerson Case.* Mrs. Emerson is a homeowner whose mortgage was paid off some years ago. Accordingly, her average monthly shelter costs are very small—approximately $33 per month. This is considerably below the maximum shelter allowance for a family of one of $57.00. Mrs. Emerson testified at the trial that her average utilities expenditures were $35.00 per month. This exceeds the $16.00 monthly allowance provided for by the regulations for a family of one. Applying the same analysis as in the case of a tenant, plaintiff's counsel argue that, were Mrs. Emerson able to pay shelter and utilities in one lump sum, like a tenant, she would be entitled to receive $68.00 per month. However, under the regulations, she only receives $49.00 ($33 for shelter, $16 for utilities). They conclude that Mrs. Emerson is invidiously discriminated against, vis-a-vis the tenant who makes a lump sum payment for shelter and utilities, because she is not afforded the benefit of the "housing costs" concept.

The evidence concerning the Welfare Department records indicates that some 28% of welfare recipients are homeowners. And while not stated with similar precision, the evidence also indicates that there are a substantial number of welfare recipients who pay their utilities separately from their rental: one caseworker estimated it to be about 9% of his caseload (12 out of 110); and another caseworker testified that she sees the situation complained of by plaintiffs frequently—in maybe 25% to 30% of the cases. While all of the witnesses who touched this point agreed that the more common case in the rental situation was where the tenant makes a lump sum payment to the landlord including utilities, nonetheless the record supports the conclusion that both situations occur with

frequency. From this, plaintiffs argue that the "invidious discrimination" against the class they represent is far from an isolated phenomenon.

## IV. THE COMMONWEALTH'S EVIDENCE.

The lone Commonwealth witness was Mrs. Debra Davis, Director of the Bureau of Assistance Policies and Standards with the Department of Public Welfare. *Inter alia,* Mrs. Davis' testimony established the following matters:

1. The dichotomy between shelter and utilities is not unique to Pennsylvania. Forty-nine of the fifty states provide for separate shelter and utilities allowances.

2. In cases where the department, because a tenant pays one or more (or all) utilities to the landlord together with his rental payment, makes a lump sum allowance for shelter and utilities approximating the maximum combined shelter and utilities costs, the Department does not attempt to obtain a breakdown of the payment to the landlord as to its shelter and utilities components. Mrs. Davis testified that there is no way of determining the allocation of a rental payment as between shelter and utilities, not even in the case of public housing inhabitants. Put differently, she testified that it is administratively impossible to determine utilities costs in the majority of the cases (*i. e.,* those where the rental payment includes the utilities).

3. If the relief sought by plaintiffs were to eventuate, and shelter savings to be applied to excess utility costs within the level of the combined maximum, or if a flat grant were instituted with respect to housing costs consisting of both shelter and utilities, there would be required a substantial additional expenditure by the Commonwealth for the welfare system. This would mean that, if additional funds were not available, there would have to be a pro rata reduction in the assistance allotments to all recipients.

4. Approximately 57% of the welfare recipients pay a sum equal to or greater than the maximum allotment for shelter costs. If plaintiffs were granted the requested relief, and individuals paying more than the maximum utility allowance but less than the maximum shelter allowance were permitted to apply shelter savings to excess utility costs, these individuals would be given an *advantage* over those individuals who receive the maximum shelter allowance but who *also* have utility bills in excess of the maximum utility allowance and would therefore not receive that excess.

5. A three-bedroom house, for instance, cannot be "costed out" into a standard, because of the wide variability in housing costs. One purpose of permitting the shelter allowance to be based upon actual expenditure is to permit freedom of mobility by the welfare recipient.

6. There are 300,000 recipients of welfare payments in Pennsylvania, and approximately 600,000 individuals are affected by the program.

7. Efforts have been made to achieve a flat grant for each welfare recipient in Pennsylvania, but these efforts have been unsuccessful.

Mrs. Davis concluded by expressing the view that it is impossible to combine those items based upon standards and those based upon actual costs and achieve an equitable result.

## V. THE CASE OF DANDRIDGE v. WILLIAMS.

It has been settled law for some time now that the benefit of the equal protection clause is extended to recipients of public assistance benefits. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). To meet the test of equal protection of the laws, the state-imposed classification or regulation must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and the distinction drawn must be rationally related to furthering the purposes of the act in respect to which the classification is established. Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) ;

F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920).[7]

The controlling formulation by the Supreme Court of the applicability of the equal protection clause to state welfare regulations is found in the recent case of Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). *Dandridge* provides the matrix for decision in this case. *Dandridge* considered the Maryland welfare statute which provides grants to most families in accord with the ascertained standard of need, but imposes an upper limit upon the total amount of money any one family can receive.

The Maryland statute computes the standard of need for each eligible family based upon the number of children in the family and the circumstances under which the family lives. In general, the standard of need increases with each additional person in the household, but the increments become proportionately smaller. The plaintiffs in *Dandridge* all had large families, so that their standards of need as computed by the State substantially exceeded the maximum grants that they actually received under the regulation. They urged "that the maximum grant limitation operates to discriminate against them merely because of the size of their families, in violation of the Equal Protection Clause of the Fourteenth Amendment."

The *Dandridge* Court upheld the Maryland flat grant limitation. *Inter alia,* the court said:

"Given Maryland's finite resources, its choice is either to support some families adequately and others less adequately, or not to give sufficient support to any family. We see nothing in the federal statute that forbids a State to balance the stresses that uniform insufficiency of payments would impose on all families against the greater ability of large families—because of the

inherent economies of scale—to accommodate their needs to diminished per capita payments. * * *

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.

\* \* \* \* \* \*

But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. * * * But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients."

The *Dandridge* Court found that the Maryland statutory maximum encouraged gainful employment, maintained an equitable balance between welfare families and the working poor, provided incentives for family planning and allocated the public funds in such a way as to meet the needs of the largest possible number of families. It is significant to note that *Dandridge* and a related

---

7. Saving welfare money is, in and of itself, a constitutionally insufficient basis for disparate treatment of similarly situated persons. Shapiro v. Thompson, *supra*; Leger v. Sailer, 321 F.Supp. 250 (E.D.Pa., 1970).

case [8] struck down lower court determinations of the *invalidity* of flat grant maximum statutes. It is plain that the teaching of *Dandridge* is that broad leeway must be given to state officials in connection with the allocating of welfare funds, and that equal protection violations must be declared only in the clearest of cases.[9]

## VI. DO THE REGULATIONS IN QUESTION PASS CONSTITUTIONAL MUSTER?

It cannot be gainsaid that the Pennsylvania Manual does not treat Mrs. Emerson and Mrs. Groff differently from a public assistance recipient who rents a dwelling and makes a lump sum payment to her landlord, covering rent and utilities. Neither is plaintiffs' argument that substantial differences in assistance grants should not be made to turn on the purely fortuitous circumstance of whether a tenant pays for utilities separately, or whether he pays it together with rental, unappealing. But plaintiffs' case cannot pass the *Dandridge* test. The reasons are as follows:

*First.* The impossibility of apportioning utilities allowances on anything other than a standard is at once apparent. One has only to consider the myriad of items which go into utilities costs, and their variability, depending upon the season of the year, to at once sense the wisdom of the standard as an approach. On the other hand, the wide variation in housing costs is also a matter of common knowledge, making the wisdom of tying shelter allowances to actual costs equally plain. Given this fundamental structure, it is administratively impossible to separate out from a monthly rental payment the sum representing shelter and the sum representing utilities where a lump sum is made. It is apparent that the average tenant does not know how much is apportionable to shelter and how much to utilities, and perhaps the landlord doesn't either. To ask the Welfare Department to determine it would be to create an administrative nightmare, if not an impossibility. And yet, precisely because of the impossibility of sorting out the elements of the lump sum rental payment, if the Department is to give the tenant who makes that payment a shelter and utilities allowance, as the regulations require, there is no way to do it other than by allowing him the combined payment.

*Second.* While giving the tenant who pays shelter and utilities together the benefit of the combined payment up to the combined maxima may bring about some inequality between him and the tenant or homeowner who pays his utilities separately, it must be remembered that *Dandridge* holds that it is not every inequality in the administration of welfare programs which offends the Constitution.

*Third.* The record has established that there is a rational and widely accepted dichotomy between shelter and utilities in welfare administration, based upon the essentially different nature of the two items.

*Fourth.* While plaintiffs seek relief from the Court in the form of invalidating the regulations and requiring shelter savings to be applied to excess utilities costs up to the combined shelter and utilities maxima, this solution also creates discrimination between two classes of individuals subject to the regulations. Consider those who would receive the benefit of the relief sought, such as Mrs. Emerson or Mrs. Groff, on the one hand, and those who already receive the maximum shelter allowance, but also pay excess utilities, on the other. If the relief sought were granted, Mrs. Groff and

8. Montgomery v. Kaiser, 397 U.S. 595, 90 S.Ct. 1349, 25 L.Ed.2d 593 (1970).

9. *Dandridge* was perhaps presaged by the decision of the United States Court of Appeals for the Seventh Circuit in Money v. Swank, 432 F.2d 1140 (7th Cir. 1970), which upheld against equal protection attack the treatment of welfare recipients dependent uj on whether the recipient attended vocational school (eligible for benefits) or college (not eligible).

Mrs. Emerson would receive payments in excess of the utilities standard, while members of the other group would not. The Court is not unaware of the fact that *Dandridge* upheld the concept of a statutory maximum. The example is given to illustrate that some inequality is inevitable, no matter how the program is structured and that inequality is created by the very solution offered for the alleged wrong in this case.

 *Fifth.* The relief sought contemplates the virtual rewriting by the Court of this part of the Pennsylvania regulations, by requiring shelter and utilities to be lumped into a housing cost concept with a flat grant, despite the evidence as to the rational, historical and practical base for different treatment of the two. Mrs. Davis, in fact, opined, and the Court might well agree, that this approach would be more desirable. However, in addition to the evil of revision of an administrative scheme by judicial fiat, this would require a substantially increased expenditure of funds, which the state does not have, and would cause a diminution pro rata in the assistance grants of all recipients. As the *Dandridge* case points out, the equal protection clause, in according the states broad leeway in administering limited welfare funds, does not require that a state must choose between attacking every aspect of a problem or not attacking the problem at all, or empower us to "second-guess" officials in this area. Moreover, the Fourteenth Amendment does not give the federal courts power to impose upon the states their view of wise economic or social policy.

 In consideration of the foregoing, we have determined, in the words of *Dandridge*, that the solutions provided by the Pennsylvania Manual to the practical problems of welfare administration in the area of shelter and utilities do have some reasonable basis. Although the regulations result in some inequality, the Court believes that the factors set forth above reasonably justify them. From these factors it may be seen that our decision has been based in part upon administrative feasibility (or avoidance of administrative chaos). As we read Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), administrative matters are a relevant consideration. But, our principal holding is that there is a rational basis for difference in treatment between Mrs. Emerson and Mrs. Groff on the one hand, and those who pay shelter and utilities together on the other. Moreover, we conclude that, as we view them in their entirety, the Pennsylvania public assistance regulations have, no less than those involved in *Dandridge,* attempted to allocate public funds in such a way as to meet the needs of the largest number of families.

In view of our determination that the regulations under attack do not offend the equal protection clause of the Fourteenth Amendment to the United States Constitution, judgment will be entered for the defendants. This Opinion shall constitute our findings of fact and conclusions of law in accordance with federal rule 52(a).

