MOORE ET AL. *v.* OGILVIE, GOVERNOR
OF ILLINOIS, ET AL.

No. 620.  Argued March 27, 1969.—Decided May 5, 1969.

*Richard F. Watt* argued the cause for appellants.
With him on the brief were *Richard L. Mandel* and *Ira A.
Kipnis.*

*John J. O'Toole* and *Richard E. Friedman,* Assistant
Attorneys General of Illinois, argued the cause for
appellees.  With them on the brief was *William J. Scott,*
Attorney General.

Opinion of the Court by Mr. Justice Douglas, announced by Mr. Justice Brennan.

This is a suit for declaratory relief and for an injunction, 28 U. S. C. §§ 2201, 2202, brought by appellants who are independent candidates for the offices of electors of President and Vice President of the United States from Illinois. The defendants or appellees are members of the Illinois Electoral Board. Ill. Rev. Stat., c. 46, §§ 7–14. In 1968 appellants filed with appellees petitions containing the names of 26,500 qualified voters who desired that appellants be nominated. The appellees ruled that appellants could not be certified to the county clerks for the November 1968 election because of a proviso added in 1935 to an Illinois statute requiring that at least 25,000 electors sign a petition to nominate such candidates. The proviso reads:

"that included in the aggregate total of 25,000 signatures are the signatures of 200 qualified voters from each of at least 50 counties." Ill. Rev. Stat., c. 46, § 10–3 (1967).

A three-judge District Court was convened, 28 U. S. C. §§ 2281, 2284, which, feeling bound by *MacDougall* v. *Green,* 335 U. S. 281, dismissed the complaint for failure to state a cause of action. 293 F. Supp. 411. The case is here on appeal. 28 U. S. C. § 1253.

On October 8, 1968, the same day the case was docketed, appellants filed a motion to advance and expedite the hearing and disposition of this cause. Appellees opposed the motion. On October 14, 1968, we entered the following order:

"Because of the representation of the State of Illinois that 'it would be a physical impossibility' for the State 'to effectuate the relief which the appellants seek,' the 'Motion to Advance and Expedite the

Hearing and Disposition of this Cause' is denied. MR. JUSTICE FORTAS would grant the motion." 393 U. S. 814.

Appellees urged in a motion to dismiss that since the November 5, 1968, election has been held, there is no possibility of granting any relief to appellants and that the appeal should be dismissed. But while the 1968 election is over, the burden which *MacDougall* v. *Green, supra,* allowed to be placed on the nomination of candidates for statewide offices remains and controls future elections, as long as Illinois maintains her present system as she has done since 1935. The problem is therefore "capable of repetition, yet evading review," *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* 219 U. S. 498, 515. The need for its resolution thus reflects a continuing controversy in the federal-state area where our "one man, one vote" decisions have thrust. We turn then to the merits.

*MacDougall* v. *Green* is indistinguishable from the present controversy. The allegations in that case were that 52% of the State's registered voters were residents of Cook County alone, 87% were residents of the 49 most populous counties, and only 13% resided in the 53 least populous counties. The argument was that a nominating procedure so weighted violates the Equal Protection Clause.

Today, in contrast, 93.4% of the State's registered voters reside in the 49 most populous counties, and only 6.6% are resident in the remaining 53 counties. The constitutional argument, however, remains the same.

Five members of the Court held in *MacDougall* that a State has "the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting

their political weight at the polls not available to the former." 335 U. S., at 284. Three members of the Court dissented on the ground that the nominating procedure violated the Equal Protection Clause. One member of the Court voted not to exercise this Court's jurisdiction in equity to resolve the dispute.

While the majority cited *Colegrove* v. *Green,* 328 U. S. 549, as their authority for denying relief and while a few who took part in *Colegrove* put this type of question in the "political" as distinguished from the "justiciable" category, 328 U. S., at 552, that matter was authoritatively resolved in *Baker* v. *Carr,* 369 U. S. 186, 202. When a State makes classifications of voters which favor residents of some counties over residents of other counties, a justiciable controversy is presented. 369 U. S., at 198–204.

When we struck down the Georgia county-unit system in statewide primary elections, we said:

> "How then can one person be given twice or ten times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment." *Gray* v. *Sanders,* 372 U. S. 368, 379.

*Reynolds* v. *Sims,* 377 U. S. 533, held that a State in an apportionment of state representatives and senators among districts and counties could not deprive voters in

the more populous counties of their proportionate share of representatives and senators.

> "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." 377 U. S., at 555.

We have said enough to indicate why *MacDougall* v. *Green* is out of line with our recent apportionment cases. The use of nominating petitions by independents to obtain a place on the Illinois ballot is an integral part of her elective system. See *People* v. *Election Commissioners,* 221 Ill. 9, 18, 77 N. E. 321, 323. All procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgment of the right to vote. *United States* v. *Classic,* 313 U. S. 299, 314–318; *Smith* v. *Allwright,* 321 U. S. 649, 664.

*Dusch* v. *Davis,* 387 U. S. 112, is not relevant to the problem of this case. There each councilman was required to be a resident of the borough from which he was elected. Like the residence requirement for state senators from a multi-district county (*Fortson* v. *Dorsey,* 379 U. S. 433), the place of residence did not mark the voting unit; for in *Dusch* all the electors in the city voted for each councilman.

It is no answer to the argument under the Equal Protection Clause that this law was designed to require state-wide support for launching a new political party rather than support from a few localities. This law applies a rigid, arbitrary formula to sparsely settled counties and populous counties alike, contrary to the constitutional

theme of equality among citizens in the exercise of their political rights. The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government.

Under this Illinois law the electorate in 49 of the counties which contain 93.4% of the registered voters may not form a new political party and place its candidates on the ballot. Yet 25,000 of the remaining 6.6% of registered voters properly distributed among the 53 remaining counties may form a new party to elect candidates to office. This law thus discriminates against the residents of the populous counties of the State in favor of rural sections. It, therefore, lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment.

*MacDougall* v. *Green* is overruled.

*Reversed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE HARLAN joins, dissenting.

I cannot join in the Court's casual extension of the "one voter, one vote" slogan to a case that involves neither voters, votes, nor even an ongoing dispute.

First of all, the case is moot. The appellants brought this action merely as prospective "candidates for the offices of Electors of President and Vice-President of the United States from the State of Illinois to be voted on at the general election to be held on November 5, 1968." But the 1968 election is now history, and no relief relating to its outcome is sought. In the absence of any assertion that the appellants intend to participate as candidates in any future Illinois election, the Court's reference to cases involving "continuing controversies" between the parties is wide of the mark. Cf. *Golden* v. *Zwickler, ante,* p. 103. There simply remains no judicially cognizable dispute in this case. Since, however, the Court reaches a

contrary conclusion, I shall indicate briefly the reasons for my disagreement with its holding on the merits.

The legislative apportionment cases, upon which the Court places its entire reliance, were decided on the theory that *voters* residing in "underrepresented" electoral districts were denied equal protection.

> "Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there." *Reynolds* v. *Sims,* 377 U. S. 533, 563.

In this case, by contrast, the appellants have sued merely as prospective candidates for office. They claim no impairment whatever of any interests they might have as voters; indeed, their complaint contains no allegation that any of them is in fact a qualified Illinois voter. Undeterred by the appellants' failure to explain how or as against whom they themselves are denied equal protection, however, the Court reaches out to hold that this statute "discriminates against the residents of the populous counties of the State in favor of rural sections." But since no "residents of the populous counties of the State" have asserted any rights, the Court's decision represents at best an advisory vindication of interests not involved in this case.

Even if the interests of voters in Illinois' "populous counties" were actually represented here, the Court's conclusion would still be completely unjustified. *Reynolds* v. *Sims, supra,* and its offspring at least involved situations in which the "debasement" or "dilution" of voting power found by the Court was the "certain" result of population variations among electoral districts. Under the Illinois statute now before us, however, no injury whatever is suffered by voters in heavily populated areas so long as their favored candidates are able to secure places on the ballot. And there is absolutely no indication in the record that the appellants could not, if they had made

the effort, have easily satisfied Illinois' 50-county, 200-signature requirement. Indeed, there is no suggestion that the counties from which the appellants drew their support were "populous" rather than "rural." The rationale of *Reynolds* v. *Sims* simply does not control this case.

Any reliance by the Court on *Williams* v. *Rhodes*, 393 U. S. 23, would also be misplaced. That case involved an Ohio requirement that new political parties secure the support of over 433,000 persons—15% of the electorate—before their candidates could appear on the ballot. Here, the 25,000 signatures required by Illinois represent only about one-half of one percent of the total number of Illinois voters—a percentage requirement permissible, one would hope, under any view of the *Rhodes* case. Nor do the appellants make any showing that securing 200 signatures in less than half of the State's counties would be a burden at all comparable to that involved in *Williams* v. *Rhodes*.

The Court held in *MacDougall* v. *Green*, 335 U. S. 281, in sustaining the very statutory requirement here at issue,[1] that Illinois had pursued an "allowable State policy [of] requir[ing] that candidates for state-wide office should have support not limited to a concentrated locality." *Id.*, at 283. That conclusion seems to me to be no less sound today than it was at the time of the *MacDougall* decision.[2] Illinois' policy is, in fact, not at

---

[1] *MacDougall* involved Ill. Rev. Stat., c. 46, § 10–2, relating to ballot position for candidates of new political parties; Ill. Rev. Stat., c. 46, § 10–3, involved here, imposes identical signature requirements for independent candidates.

[2] While *MacDougall* involved candidates for various offices, the appellants here all sought election as presidential electors. See U. S. Const., Art. II, § 1:

"Each State shall appoint, *in such Manner as the Legislature thereof may direct*, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ." (Emphasis added.)

all unlike that upheld by the Court only two Terms ago in *Dusch* v. *Davis,* 387 U. S. 112, in which a district-residence requirement imposed upon municipal officers despite population variations among districts was nevertheless held proper as reasonably "reflect[ing] a detente between urban and rural communities . . . ." *Id.,* at 117. Cf. *Lucas* v. *Forty-Fourth General Assembly,* 377 U. S. 713, 744 (STEWART, J., dissenting); *Reynolds* v. *Sims, supra,* at 589 (HARLAN, J., dissenting).

I respectfully dissent.