**Caryl BENDINGER et al., Plaintiffs,**

v.

**Richard B. OGILVIE et al., Defendants.**

**No. 71 C 2037.**

United States District Court,
N. D. Illinois, E. D.

Nov. 16, 1971.

---

Andrew J. Leahy and Mary Lee Leahy, Chicago, Ill., for plaintiffs.

William J. Scott, Atty. Gen. of Ill., for defendants.

Before CUMMINGS, Circuit Judge, and DECKER and McMILLEN, District Judges.

DECKER, District Judge.

This is a suit brought by Caryl Bendinger, Henry Krasnow, Martin Oberman and Carlton Zucker against the members of the Illinois State Electoral Board, both in their individual capacities and as members of the Board. Plaintiffs seek a declaratory judgment which would hold unconstitutional the Illinois statutory requirement that in order to be an eligible candidate in a political party primary, a person cannot have "requested a primary ballot of any other party at a primary election held within 2 years of the date on which the petition [for nomination] must be filed." Ill. Rev.Stat. ch. 46, § 8–8. The case arises out of the following agreed-upon facts.

Plaintiff Oberman seeks to become a candidate for election to the Illinois General Assembly in the primary election of the Democratic Party. In order to become such a candidate, he must first be certified by the Illinois State

Electoral Board which must, as one of the pre-requisites of certifying him, determine that he has not voted in the primary election of another party within the two years preceding the filing of his petition. However, plaintiff Oberman, who claims to be a member of the Democratic Party, did vote in the primary election of the Republican Party on March 17, 1970. As a consequence, he is not eligible to be a candidate for the Democratic nomination to the Illinois General Assembly in the March 21, 1972 Democratic primary. He contends that the Illinois statute which renders him unable to be such a candidate thereby violates his right of free association which is protected by the First and Fourteenth Amendments. Plaintiffs Bendinger, Krasnow and Zucker are registered voters who wish to vote for Mr. Oberman in the March 21, 1972 Democratic primary. They contend that their First and Fourteenth Amendment rights to vote and to associate freely are violated by the statute which prevents Mr. Oberman from becoming a candidate.

This matter is presented to the court on the basis of the complaint, plaintiffs' motion for summary judgment, F.R.Civ. P. § 56, and defendants' motion to dismiss. F.R.Civ.P. § 12. Plaintiffs have moved that a three-judge court be convened, and that motion, having been unopposed by defendants, was granted. 28 U.S.C. §§ 2281, 2284. There is no genuine issue as to any material fact in this cause, F.R.Civ.P. § 56(c), thus it is proper to treat the opposing motions as ones for summary judgment, and to dispose of the case on the merits.

First, it is necessary to dispose of two threshold issues. Despite defendants' argument to the contrary, it is quite clear that plaintiffs have standing to sue and that this court is presented with a justiciable controversy. In Jackson v. Ogilvie, 325 F.Supp. 864 (N. D.Ill.) (per curiam), aff'd mem., 403 U. S. 925, 91 S.Ct. 2247, 29 L.Ed.2d 705 (1971), plaintiffs were a candidate for Mayor of the City of Chicago and his potential supporters who were contesting the Illinois statutory requirements governing the number of signatures which were required for an independent candidate's nominating petition.

The court in *Jackson* relied upon the reapportionment cases, Wesberry v. Sanders, 376 U.S. 1, 5–7, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), and Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962), to support its conclusion that plaintiffs had presented a justiciable controversy. The court reasoned, also from the reapportionment cases, that the supporters of the aspiring mayoral candidate had standing to sue because their right to vote was impaired, and that the plaintiff-candidate had standing because the right to hold public office was a necessary concomitant of the right to vote. Jackson v. Ogilvie, 325 F.Supp. at 866. For the purposes of the issues of justiciability and standing, the *Jackson* case and the instant case are indistinguishable. Thus, plaintiffs have presented a justiciable controversy to this court and have the requisite standing to assert it to this court. Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).

Turning to the constitutional issues which are presented, plaintiffs contend that the "24 month rule", the popular name for the statute in issue, violates their rights to associate freely and to vote. The so-called "freedom of association" to which the plaintiffs refer, is the freedom to associate together freely in organizations which espouse a particular point of view. Similarly, the right to vote in this case represents the right to vote for a candidate who espouses certain views. Specifically, the plaintiffs contend that the statute in question is overly restrictive to the point that the aforementioned rights are effectively denied.

Before a state can place any restrictions upon the freedom to associate freely and to vote, it must be shown that a compelling state interest justifies such regulation. Williams v. Rhodes, 393 U. S, 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); N.A.A.C.P. v. Button, 371 U.S. 415, 83

S.Ct. 328, 9 L.Ed.2d 405 (1963); Jackson v. Ogilvie, *supra*. Further, it must be shown that the state statute in question is not only as fair as possible, but also that it infringes upon the First Amendment rights of those affected as little as practicable under the circumstances. Williams v. Rhodes, *supra*, 393 U.S. at 32, 33, 89 S.Ct. 5; Briscoe v. Kusper, 435 F.2d 1046 (7th Cir. 1970); Jackson v. Ogilvie, *supra*. In the case at bar, the State of Illinois has clearly satisfied both of these requirements.

■ With regard to the statute in question, there can be no doubt that the Illinois legislature had several compelling reasons for passing the so called "24 month rule." In Briscoe v. Kusper, *supra*, the Seventh Circuit Court of Appeals made it quite plain that a state has a substantial interest in the administration of its own local elections. The court went on to explain that this state concern reasonably included the regulation of candidates to the extent that their access to the ballot might be limited in order to prevent the subversion of the elective process. In that case, which involved a challenge of procedures used in processing objections to aldermanic nominating petitions, the chief purpose of the regulations in question was to limit the number of candidates on the ballot so as to insure that those candidates who were on the ballot had demonstrated both initiative and some measure of voter appeal. In this way it was felt that the elective process would be limited to some manageable proportion.

In the case at bar, it is clear that this same rationale underlies the "24 month rule." Consider the confusion which could result from having a multitude of party-swapping candidates in the primary election of one party. Not only would the overabundance of candidates be confusing to the voters in terms of absolute numbers, but the questions presented by the dubious party patriotism and voter appeal of some of the candidates would create a situation which could make a mockery of the election process.

In addition to the policy of limiting the elective process to manageable and realistic proportions, there are even more serious and compelling reasons underlying this legislation. The most important of these is the prevention of the subversion of the entire elective process. The keystone of our democracy is the party system of politics. Before any general election, each party must go through its manpower resources in order to find a candidate who not only represents a consensus of the opinions of the members of his own party, but will be appealing to a majority of the entire voting population as well. If there were no "24 month rule", then this system could be thrown into total chaos. For instance, suppose Party A had a strong candidate for a certain post and it was clear that he would receive his party's nomination with votes to spare. Without the deterrent effect of the "24 month rule" it would be a relatively simple matter for Party A to have one or more of its party regulars run in Party B's primary in the hope that one would win the Party B primary and then put up little or no opposition to the Party A candidate in the ensuing general election. The resulting confusion and subversion of the elective process is obvious, and, without the "24 month rule", could not be controlled.

There is another obvious reason which is clearly compelling and which underlies this legislation. It, too, is grounded in the protection of the elective process. That is the question of protecting the party system as we know it. Without rules like the "24 month rule", party swapping and changing might conceivably become so prevalent that the average political party could no longer function properly. With the resulting disruption of party unity and discipline, a political party would be unable to decide who to support because the person whom they did or did not support today could be on the other side of the aisle tomorrow. Thus, it is obvious that the "24 month rule" protects the elective process from subversion from many sides and thereby

serves to promote the most compelling of state interests.

Plaintiffs rely on Gordon v. Executive Committee of the Democratic Party of the City of Charleston, 71–852 (D.S.C. September 28, 1971), in support of their argument that the "24 month rule" is unconstitutional. However, *Gordon* dealt with the restriction upon party switching placed on voters in primary elections. The instant case involves the restriction placed upon candidates in primary elections. The state's interest in limiting candidates from switching parties, as detailed above, is greater than its interest in limiting voters from switching parties. The state's interest in preserving a vigorous and competitive two-party system is fostered by the requirement that candidates demonstrate a certain loyalty and attachment to the party in whose primary they are running; the same cannot be said of voters, however, who should be freer to demonstrate their changes in political attitude by voting for popular candidates or against unpopular candidates in any party's primary election. Thus, it is not inconsistent to prevent candidates from switching parties from election to election and at the same time to permit voters to do so.

Plaintiffs' reliance upon Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), and Carter v. Dies, 321 F.Supp. 1358 (N.D.Tex.1970), is likewise misplaced. *Moore* involved the extension of the principle of one-man-one-vote to invalidate a state statute which required nominating petitions for state offices to include signatures of 200 qualified voters from each of at least 50 counties. It said nothing about a candidate's rights under the First and Fourteenth Amendments. In *Williams,* the court held that a state statute which discriminated against minority parties to the benefit of the Democratic and Republican Par-

ties violated the Equal Protection Clause of the Fourteenth Amendment. Again, nothing was said about a candidate's First Amendment rights. The issue in *Carter* was not the constitutionality of a state statute which prohibited candidates from switching parties, but rather the constitutionality of a state statute requiring a candidate to pay certain filing fees. It is clear from the foregoing that none of the election cases cited by plaintiffs supports their argument.

It is also clear that the statute is not overbroad. Plainly, the political party for which a person voted in the last primary election is an excellent indicator of party allegiance. It is clear, concise and unalterable. Any lesser indication, such as the oath suggested by the plaintiffs,[1] would quite clearly be subject to possible misinterpretation and abuse. Nor would it do for the court to substitute its judgment for that of the legislature and prescribe a period of time shorter than 24 months. Accordingly, it is clear that the "24 month rule" is as narrow as possible under the circumstances in order to accomplish its legislative purpose.

The defendants' motion to dismiss will be treated as a motion for summary judgment, American Casualty Company of Reading, Pa. v. Reidy, 386 F.2d 795 (7th Cir. 1967); Sticker Industrial Supply Corp. v. Blaw-Knox Co., 367 F.2d 744 (7th Cir. 1966), and in light of the foregoing, the motion will be granted. Accordingly, judgment is hereby entered for defendants, and the cause is dismissed.

McMILLEN, District Judge (concurring).

I concur with the result. However, I do not believe that the plaintiffs plead an actual case or controversy with the defendants which justifies a declaratory judgment, and I would therefore dismiss the complaint for this reason.

---

1. In their brief, plaintiffs suggest that an oath to the effect that the candidate believes in the principles of the party in whose primary he sought to run would suffice to protect the integrity of the elective process.

The plaintiff Oberman has not yet attempted to qualify as a candidate for the legislature. The other plaintiffs may or may not be deprived of the opportunity to support him at the election on March 21, 1972. A number of things could happen before the filing date of December 21, 1971 or before the election which would resolve the matter.

Although the three-judge court's decision in Jackson v. Ogilvie, 325 F.Supp 864 (N.D.Ill.1971) allowed a declaratory action to be filed by a prospective candidate, the first opinion by the United States Supreme Court reveals that the date for filing Jackson's election petition had passed by the time of the Supreme Court's opinion. There was therefore an actual controversy with the Election Board (401 U.S. 904, 91 S.Ct. 642, 27 L. Ed.2d 803 (1971)).

Nevertheless the Supreme Court declined to advance this case, stating at 401 U.S. 904, 91 S.Ct. 642–643:

> The court properly stays its hand in this election case that comes to us with the customary plea for emergency action. It was not entirely clear that the three-judge court was properly convened. But assuming it was, the case is peculiarly appropriate for application of the abstention doctrine which we recently applied in Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68. . . .

> What appellants ask us in substance to do is to sit in direct review of the Election Board. . . . Federal courts cannot act responsibly in those situations.

The three-judge court's opinion was eventually affirmed without opinion (403 U.S. 925, 91 S.Ct. 2247, 29 L.Ed.2d 705), but the existence of a justiciable controversy was not again discussed by either court. The cases cited by the three-judge court on this point in the *Jackson* case (Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, and Wesberry v. Sanders, 376 U.S. 1, 84 S. Ct. 526, 11 L.Ed.2d 481) are not persuasive in the case at bar where the plaintiffs are seeking the invalidation of a statute which has not yet been applied to any of them.

Therefore I would heed the caveat of the United States Supreme Court by dismissing the complaint for lack of present jurisdiction over the subject matter. 28 U.S.C. § 2201.