Harriet G. PONTIKES, Plaintiff,

v.

Stanley KUSPER et al., Defendants.

Donna KLAETSCH and Peter Lombardo, Plaintiffs,

v.

Grace Mary STERN, County Clerk, Defendant.

Nos. 71 C 2363, 71 C 2415.

United States District Court,
N. D. Illinois, E. D.

March 7, 1972.

Mary Lee Leahy, Andrew J. Leahy, Chicago, Ill., for plaintiff Klaetsch.

Ray Jeffrey Cohen, Chicago, Ill., for plaintiff Pontikes.

Howard Miller, Aldus S. Mitchell, Sophia H. Hall, Chicago, Ill., for defendants.

Before SWYGERT, Chief Circuit Judge, and MAROVITZ and BAUER, District Judges.

SWYGERT, Chief Circuit Judge.

This case consolidates two actions, each of which attacks the constitutionality of sections 7–43(a), (d), and 7–44 of Chapter 46, Ill.Rev.Stat. Sections 7–43(a) and 7–44 condition voting in any primary upon a public declaration of party affiliation. Section 7–44 prohibits voting in the primary of one party if the voter has voted in the primary of another party within the preceding twenty-three months.[1] Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2281 and 42 U.S.C. § 1983.

The parties bringing the action are qualified Chicago and Lake County voters (plaintiffs Pontikes and Lombardo, respectively) who had voted in one party's primary in February 1971 and who now seek to vote in a different party's primary in March 1972, and a Lake County voter (plaintiff Klaetsch) who, though eligible to vote in any primary, challenges the restrictions that will attend her voting in March. Defendants are those officials responsible for the conduct of primary and general elections in each area, the Commissioners of the Chicago Board of Elections and the Clerk of Lake County.

The complaint in Pontikes v. Kusper was filed in district court in September 1971 and that in Klaetsch v. Stern in October 1971. A request for a three-judge court was subsequently granted, and the two actions were consolidated. The plaintiffs principally charge that section 7–43(d), which outlines the so-called "twenty-three month" rule, is unconstitutional because it impinges upon the right to vote and the right of association. They claim further that sections 7–43(a) and 7–44, the sections requiring a declaration of party affiliation, should fall as violative of the right to privacy, the right to vote, the right of association, and the provisions of the Voting Rights Act of 1960, 42 U.S.C. § 1971. They seek summary judgment based on these contentions. The defendants move to dismiss the complaint on the ground that no "case or controversy" has been presented, that no substantial federal question has been raised to vest jurisdiction in this court, and that even if jurisdiction were sustained, the federal courts should abstain from exercising it. We find no merit to these contentions and accordingly, we deny the defendants' motion. We grant the plaintiffs' motion for summary judgment only where section 7–43(d) is concerned. We find no basis for overturning sections 7–43(a) or 7–44.

## I

The issues raised in the defendants' motion to dismiss have been considered and rejected by this court and others. Numerous cases have held that constitutional attacks on primary regulations by those immediately affected,

---

1. Sections 7–43 and 7–44 provide:

§ 7–43. No person shall be entitled to vote at a primary:

(a) Unless he declares his party affiliations as required by this Article;

(b) Who shall have signed the petition for nomination of a candidate of any party with which he does not affiliate, when such candidate is to be voted for at the primary;

(c) Who shall have signed the nominating papers of an independent candidate for any office for which office candidates for nomination are to be voted for at such primary; or

(d) If he [shall have voted after January 1, 1939] at a primary held under this Article 7 of another political party within a period of 23 calendar months next preceding the calendar month in which such primary is held. . . .

\* \* \* \* \*

§ 7–44. Any person desiring to vote at a primary shall state his name, residence and party affiliation to the primary judges. . . . No person who refuses to state his party affiliation shall be allowed to vote at a primary.

prior to the primary date, do meet the requirements of a "case or controversy." *See* Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Rosario v. Rockefeller, No. 71–C–1573—Eisner v. Rockefeller, No. 71–C–1621 (E.D.N.Y., filed Feb. 10, 1972); Bendinger v. Ogilvie, 335 F.Supp. 572 (N.D.Ill., 1971); Jackson v. Ogilvie, 325 F.Supp. 864 (N. D.Ill.1971).

■ Moreover, this action raises several significant federal questions, principally the impact of the challenged statutes on the plaintiffs' right to vote and right of association. In Bendinger v. Ogilvie, *supra*, which involved a statute barring candidates from running in a primary who had voted in another party's primary within the preceding twenty-four months, this court did not contest the fact that primaries were subject to federal constitutional standards and considered only whether these standards were met. Similarly, jurisdiction was properly found in two recent federal cases which dealt with primary election procedures comparable to those at issue here, Gordon v. Executive Comm. of the Democratic Party of the City of Charleston, 335 F.Supp. 166 (D.S.C. 1971), and Rosario v. Rockefeller, *supra*.

■ Finally, we see no reason to abstain from exercising our jurisdiction. There are no unsettled questions of state law at issue here which would require state court interpretation. The statutes involved are unambiguous. The only point in question is their conformity to the federal Constitution, a question we are mandated to resolve.

## II

■■ The plaintiffs' attack against section 7–43(d) is grounded upon both the right of association and the right to vote. We agree that the "twenty-three month rule" substantially burdens plaintiffs' right to vote in derogation of Article I, § 2 of the Constitution, S.H.A. Those who have voted in the March 1971 primary of one party are now deprived

of the right to vote in the March 1972 primary should they choose to switch parties at this time. Even voters eligible to vote in any primary this March are affected since they are forced to choose between their right to vote and their right to freely affiliate within the twenty-three month period following the election. The defendants counter that the right to vote protected by the Constitution does not include the right to vote in a primary. They characterize primaries as the purely internal procedures of private organizations. We find the holding in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), dispositive:

> Where the state law has made the primary *an integral part of the procedure of choice,* or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, § 2. 313 U.S. at 318, 61 S.Ct. at 1039. (Emphasis added.)

*See* Williams v. Rhodes, *supra*; Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1968); Gray v. Sanders, 372 U.S. 367, 83 S.Ct. 801, 9 L.Ed.2d 821 (1962); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Gordon v. Exec. Comm., *supra*; Rosario v. Rockefeller, *supra*. Since in Illinois, primaries are subject to extensive state regulation, Ill.Rev.Stat. ch. 46, they fall squarely within the test of *Classic*.

In addition, we agree that the contested statute represents a significant incursion on the plaintiffs' rights of free association. It has the effect of attaching penalties to affiliation and disaffiliation since voters may not change parties during the twenty-three month period without being disenfranchised in the party primary of their choice.

■ Where a deprivation of the right to association or the right to vote is at stake, the statute will only be upheld if the state proves that it serves a "compelling" state interest. In *Williams*, the Court considered a challenge to several Ohio election laws which were claimed to

make it "virtually impossible" for a new political party to be placed on state ballots for the purpose of choosing electors pledged for particular presidential or vice-presidential candidates. The Court stated:

> In determining whether the State has power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that 'only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.' 393 U.S. at 31, 89 S.Ct. at 11.

Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), used a "compelling state interest" standard where only a deprivation of the right to vote rather than of first amendment rights was charged. More recently this court in Bendinger v. Ogilvie, *supra*, applied the identical test. *See* Rosario v. Rockefeller, *supra*.

The interest which section 7–43(d) is claimed to protect is the state's interest in guarding against any distortions of the electoral process in general and in maintaining the integrity of the two-party system in particular. The statute serves these interests by preventing a practice known as "raiding." "Raiding" occurs when members of one party vote in the primary of another party for the sole purpose of bringing about the nomination of the weakest candidate. But the statute sweeps too broadly, impeding both deceptive conduct and constitutionally protected activities. If section 7–43(d) were not in effect, massive party switching could occur either because of the well-planned raiding of one party's primary by members of another party, or because of massive dissatisfaction with the prevailing policies of an existing party. The state's interest upon which this statute is grounded could be characterized as "compelling" only if the former alternative is more likely to occur than the latter, or if raiding constitutes a more important danger than the

danger to constitutionally protected rights however often it occurs. There is no evidence to indicate that raiding is more likely to take place than "honest" switches of affiliation. Forty-four states do not impose post-election restraints on changing affiliation. This would indicate that raiding is not a serious threat to the multi-party system.

Moreover, we cannot say that the mere possibility of raiding is more important than the potential deprivation of first amendment and voting rights this statute effects. The state's interest in maintaining a multi-party system has been found to be "compelling" at the primary level only where constitutional claims were raised by *candidates* who were barred from running in one party's primary when they had voted in another party's primary within the previous two years, Bendinger v. Ogilvie, *supra*, or within the previous four years, Lippitt v. Cipollone, 404 U.S. 1032, 92 S.Ct. 729, 30 L.Ed.2d 725 (U.S., 1972), and by *candidates* who were required to sign oaths affirming their support for the presidential and vice-presidential candidates of the party to which they claimed allegiance, Ray v. Blair, 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952).

Where—as in the instant case—the state's interest is weighed against the constitutional claims of political party *members*, the outcome has been different. In Williams v. Rhodes, *supra*, burdens on the right to form a party capable of effectively competing with other parties could not be justified by the state's interest in promoting a multi-party system. In Rosario v. Rockefeller, *supra*, and Gordon v. Exec. Comm., *supra*, state laws which affected constitutional rights in the same fashion as the Illinois law also fell where the identical justifications were offered. Indeed, dicta in Bendinger v. Ogilvie, *supra*, specifically distinguish between the associational and voting rights of members of political parties and the rights of candidates:

> The state's interest in limiting candidates from switching parties, as de-

tailed above, is greater than its interest in limiting voters from switching parties. The state's interest in preserving a vigorous and competitive two-party system is fostered by the requirement that candidates demonstrate a certain loyalty and attachment to the party in whose primary they are running; the same cannot be said of voters, however, who should be freer to demonstrate their changes in political attitude by voting for popular candidates or against unpopular candidates in any party's primary election.

These cases cannot be distinguished by characterizing the state's interest in section 7–43(d) in terms of the protection of the electoral process rather than the preservation of the two-party system. The difference is semantic. Distortion of the electoral process would here be occasioned by a distortion of the procedures of candidate selection, namely, the selection procedures of a two-party system.

We find none of the justifications offered by the state to be sufficiently compelling to outweigh the costs to constitutionally protected rights. The rights to free association and to the vote are at least as important today as they were at the time the Constitution was written. The pace of political change has greatly accelerated. A wide variety of important political events are likely to take place even during the two-year period in which voters must affiliate with a single party or be disenfranchised. Moreover, primaries held during this period are likely to reflect a broad range of important issues. The Illinois statutes provide for elections in each of the even numbered years for various state and county offices. These elections coincide with the elections for President, Vice-President, and members of Congress. Other primary elections are provided for, including special elections to fill certain vacancies, township elections, and city and village elections. These are conducted in the so-called "off years," the period between the regular primary and general elections in the even numbered years. This scheduling, coupled with the twenty-three month rule of section 7–43(d), has the effect of precluding a voter from participating in a primary of one party in a township, city, or village election and another at the regular primary level. We find this result untenable. Whatever are the advantages of maintaining party stability for elections at any given level of government, they do not apply when national, state, and local contests are considered together. A voter ought not be required to hold himself bound to a single party on every level of government.

### III

Plaintiffs claim that sections 7–43(a) and 7–44, which require a declaration of party affiliation prior to voting, burdens their rights to privacy, to freely associate, and to the vote, in addition to violating the Voting Rights Act of 1960, 42 U.S.C. § 1971. We do not agree. The voter's choice of candidates in a single party's primary is not disclosed. The only public declaration he is called upon to make is to choose which party primary to participate in. Any imposition this places on the voter is minimal. Moreover, whatever burden is suffered is outweighed by the state's "compelling" interest in preventing election fraud. Membership in a political party may be distinguished from membership in any other organization because of the role of the state in regulating and enforcing party selection procedures. *Cf.* NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488 (1958). Sections 7–43(a) and 7–44 not only serve to enforce the twenty-three month rule, as the plaintiffs claim, but also to buttress the requirement that voters participate in only one party's primary at a time.

The motion of defendants to dismiss the complaint is denied, and the motion of plaintiffs for summary judgment is granted insofar as section 7–43(d) is concerned. Section 7–43(d) of the Illinois Revised Statutes, Chapter 46, is hereby declared to be violative of the Constitution of the United States and is

null and void. Defendants, their officers, agents, servants, employees, and attorneys, and those persons who act in active concert or participation with them are permanently enjoined, without bond, from executing or enforcing section 7–43(d) of the Illinois Revised Statutes, Chapter 46.

MAROVITZ, District Judge (dissenting).

I dissent not because I disagree with the majority's characterization of the right to vote and freely associate or with the "compelling state interest" test that ought to be employed in determining whether or not an unconstitutional infringement of those rights has taken place but rather because having applied that test to the present situation, unlike the majority I have found no such infringement.

[I might note here that I fully concur in the jurisdictional findings of the majority; that a "case or controversy" does exist; that a substantial federal question has been raised; and that abstention would be improper in this case. The law is clear on these points and has been adequately documented by the majority. See Majority Opinion, *supra*, pp. 1106–1107.]

The crux of the majority opinion is based on the wholly valid proposition that any state infringement of the right to vote must be grounded in a "compelling interest" whose objective fully justifies tampering with rights so fundamental and hallowed as the right to vote and freedom of association. Indisputably the right to vote lies at the very heart of the democratic process and is a fundamental element in the principles by which this Nation is governed. Although the manifestation of this right has gone through vast political, social, demographic and geographic transformations over the years assuming the various shapes and forms suitable to the practicalities and exigencies of a particular era, its essential core stripped of historical and periodical gloss—the right

of all citizens to choose freely without governmental interference—has always remained the same. It is the purity of this core that is protected from unwarranted and unjustified state intervention. Yet one need only look at the election code of any state in the Union today to realize that some sort of regulatory election procedure is not only justified and warranted but is moreover essential to preserve voting purity and to prevent electoral anarchy. What must be pinpointed, then, is that fine line between the permissible and the impermissible.

It is because I concur in the majority's general view of the "compelling interest" test and because I do not wish my dissent to be misconstrued in any way as adulterating or altering that test or as permitting alleged violations of voting rights to be scrutinized with any less care than they are now being tested, that I find it necessary to briefly trace the development of the law in voting rights cases.

There are basically two criteria by which the constitutionality of an election statute can be judged, one objective and the other subjective. The objective test is simply the comparison of the questionable regulation with constitutional dictate and previous pronouncements of the Supreme Court. If the Supreme Court has specifically prohibited a certain practice there is no doubt that the state regulation which directly conflicts with that prohibition must fall. But the law has never been so precedentially precise as to cover all situations in all times and quite often a specific procedure upon which the Constitution and the Courts have not yet spoken is attacked. Thus, parallel with the development of specific prohibited categories of conduct and growing out of Supreme Court usage, there has evolved a subjective test that is used for those instances that do not fit into any preconceived constitutional slots. This subjective test, as used in election cases has matured from the "rational basis" to the "compelling state interest" test.

In the earlier years of our country the Congress and the Courts were concerned with the formative problem of expanding a basically limited suffrage to that of universal suffrage. The most blatant and obviously unconstitutional disenfranchisement was the quantitative exclusion of larger segments of the population such as black people and women. Both of these exclusions were cured by constitutional amendments, the latter occurring within our time, and quite understandably a state cannot now claim that it has a "compelling interest" to exclude those groups. Disenfranchisements of this sort are easily discernible and fit into clear-cut constitutional categories.

In recent years cases dealing more with the qualitative rather than quantitative aspects of the vote have reached the Supreme Court. In these instances there was no outright denial of the right to vote but rather the question raised was whether the right of suffrage is denied by dilution or debasement of a vote cast by mal-apportionment. In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) the apportionment of the Alabama Legislature's two houses was challenged on equal protection grounds.

See also Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821; Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481; United States v. Mosely, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1349; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717; United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341; Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110; Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984; Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152.

In the last decade the courts have also been faced with the narrower more limited exclusions of smaller segments of the population. Often these lesser restrictions are of a very localized and regional nature unlike the nationwide exclusions of a century ago. At times these exclusions such as poll taxes or literacy tests come cloaked in the guise of a general regulation but in reality are racially motivated having a more pronounced affect on minority groups; other times the state is simply convinced that a certain regulation is desirable and permissible. See for example: Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965): State may not deny the opportunity to vote a bona fide resident because he is a member of the armed forces. Harper v. Virginia Board of Election Commissioners, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966): State may not impose a poll tax; Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969): State may not require citizens to own or lease taxable realty in order to vote in a local election. See also City of Phoenix v. Kalodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970): State cannot refuse to permit persons living in a federal enclave to vote; Affeldt v. Whitcomb, 319 F.Supp. 69 (Three Judge Court, N.D.Ind.1970): State may not impose a one year residency requirement. See also Hadnott v. Amos, 320 F.Supp. 107 (Three Judge Court, M.D. Ala.1970), aff'd 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971) (one year residency requirement struck down) and Keppel v. Donovan, 326 F.Supp. 15 (Three Judge Court, D.Minn.1970) (6 month requirement struck down).

Thus these specific practices have explicitly been outlawed by the Supreme Court and some lower Federal Courts. Yet as indicated earlier an implicit criteria has developed out of these cases to be used in those areas yet uncharted by the Supreme Court.

The District Court in New York in Rosario, et al. v. Rockefeller, et al., 71 C. 1573 (Slip Op. February 10, 1972) spent a great deal of time in tracing the development of the subjective "compelling interest" test. In Reynolds v. Sims, *supra* the Supreme Court said that "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." 377 U.S. at 561–562, 84 S.Ct. at 1381, 12 L.Ed.2d 506. A year later in Carrington v. Rash, 380 U.S. at 96, 85 S.Ct. 775, at 780, 13 L.Ed.2d 675 the Court stated that "States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State" and in 1966 in Harper v. Virginia State Board of Elections, 383 U.S. 663 at 670, 86 S.Ct. 1079 at 1083, 16 L.Ed.2d 169 the Court indicated that "where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and confined."

The Court in Rosario went on to say:

"At the October Term of 1968, the Supreme Court continued to enlarge the divergence between the treatment to be accorded most state statutes when attacked as violating the Equal Protection Clause and the treatment to be accorded those statutes specifically affecting the right to vote. In Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), the Court was presented with a challenge to a set of Ohio statutes which made it extremely difficult for any party other than the Democratic or Republican Party to achieve the status of an established party and to have its name and its candidates placed on the ballot in the general election . . . The test applied by the Court, however, was not whether any merely rational basis could be imagined to justify the enactment of the statutes, but whether or not there was any *compelling* state interest to justify their existence . . .

The Court drew support for the use of this test from a case which had not involved the right to vote, but was solely concerned with First Amendment rights of association . . .

The Court concluded by saying that "The State has here failed to show any 'compelling interest' which justifies imposing such heavy burdens on the right to vote and to associate," and " . . . the totality of the Ohio restrictive laws taken as a whole imposes a burden on voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause." (393 U.S. at 31 and 34, 89 S.Ct. at 11 and 12).

The opinion in Williams v. Rhodes, *supra,* left one in some doubt as to whether the compelling state interest test would be applied to cases involving only voting rights and having no First Amendment overtones. Later in that same Term, however, the Court decided Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, [23 L.Ed.2d 583] (1969), and did much in the *Kramer* opinion to clarify its view of the appropriate test to be used when statutes involving the right to vote are challenged on equal protection grounds.

In *Kramer,* the challenged statute restricted the vote in local school board elections to those otherwise qualified voters who were either parents of children attending schools within the local public school system or were owners or lessees of real property within the school district . . . The Court held that the compelling state interest test applied to the voting restrictions in issue, and, finding no such interest, voided the statute . . . The Court said:

Appellant agrees that the States have the power to impose reasonable citizenship, age, and residency requirements on the availability of the ballot. Cf. Carrington v. Rash, 380 U.S. 89, 91, 85 S.Ct. 775, 777,

13 L.Ed.2d 675 (1965); Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904). Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives. [Footnote omitted.] Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest. (395 U.S. at 625–627, 89 S.Ct. 1888–1890). [Emphasis in original.]

It is evident from the Court's opinion in *Kramer* that once a state has imposed basic voting requirements of citizenship, age, and residency, all further requirements (which by their nature must be viewed as restrictions) must of necessity be supported by a compelling state interest. This in effect places the burden of proof on the state, the reverse of the situation where the rational basis test is applied. The basic requirements of citizenship, age and residency, are to be tested, when they are challenged, by the traditional, "rational relation" test, used in garden-variety equal protection cases."

We therefore have before us a clearly defined subjective test to apply in our case given the absence of any specific Supreme Court pronouncement on the constitutionality of a 23-month rule. What must be determined is whether the State of Illinois has carried the burden in proving that it has not merely a rational basis for prohibiting voting in a primary of one party by a citizen who has voted within 23 months in the primary of another party but that it has a "compelling interest". What must also be kept in mind is that voting rights are not absolute and that there is a degree of constitutional infringement short of invidiousness that is permissible as long as the infringement is compelled by a state interest and affects the rights of the voters as little as practicable under the circumstances. This in fact was part of the rationale of Bendinger, *supra,* at pp. 574–575:

"Before a state can place any restrictions upon the freedom to associate freely and to vote, it must be shown that a compelling state interest justifies such regulation. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Jackson v. Ogilvie, *supra. Further, it must be shown that the state statute in question is not only as fair as possible, but also that it infringes upon the First Amendment rights of those affected as little as practicable under the circumstances.* Williams v. Rhodes, *supra* 393 U.S. at 32, 33, 89 S.Ct. 5, 21 L.Ed.2d 24; Briscoe v. Kusper, 435 F.2d 1046 (7th Cir. 1970); Jackson v. Ogilvie, *supra.*" [Emphasis added]

The compelling interest asserted by the State is the prevention of inter-party "raiding" that would result from open primaries. Raiding occurs where members of one party vote in the primary of the opposition party in the hopes of electing a weak candidate or a "straw man" who could easily be defeated by the candidate of their true party in the general election. This might happen where the candidate of their true party is running unopposed in the primary and their votes are not needed; where a certain candidate in their party is far stronger than all challengers making their votes unnecessary and better utilized in the primary of the other party; or where members of one party in a certain district far outnumber the members of the opposition party and a great portion of the votes are expendable and can be allocated to set up a "straw man".

That such "raiding" can occur has been recognized by several Courts. In Bendinger v. Ogilvie, 335 F.Supp. 572

(N.D.Ill.) a Three Judge Court dealt with the Illinois statutory requirement that in order to be an eligible candidate in a political party primary a person cannot have "requested a primary ballot of any other party at a primary election held within 2 years of the date on which the petition must be filed." Ill.Rev.Stat. Ch. 46 Section 8–8. The Court found the statute constitutional and said:

"In addition to the policy of limiting the elective process to manageable and realistic proportions, there are even more serious and compelling reasons underlying this legislation. The most important of these is the prevention of the subversion of the entire elective process. The keystone of our democracy is the party system of politics. Before any general election, each party must go through its manpower resources in order to find a candidate who not only represents a consensus of the opinions of the members of his own party, but will be appealing to a majority of the entire voting population as well. If there were no '24 month rule', then this system could be thrown into total chaos. For instance, suppose Party A had a strong candidate for a certain post and it was clear that he would receive his party's nomination with votes to spare. Without the deterrent effect of the '24 month rule' it would be a relatively simple matter for Party A to have one or more of its party regulars run in Party B's primary in the hope that one would win the Party B primary and then put up little or no opposition to the Party A candidate in the ensuing general election. The resulting confusion and subversion of the elective process is obvious, and, without the '24 month rule', could not be controlled.

There is another obvious reason which is clearly compelling and which underlies this legislation. It, too, is grounded in the protection of the elective process. That is the question of protecting the party system as we know it. Without rules like the '24 month rule', party swapping and changing might conceivably become so prevalent that the average political party could no longer function properly. With the resulting disruption of party unity and discipline, a political party would be unable to decide who to support because the person whom they did or did not support today could be on the other side of the aisle tomorrow. Thus, it is obvious that the '24 month rule' protects the elective process from subversion from many sides and thereby serves to promote the most compelling of state interests."

The Court stopped short of applying this same compelling interest to voter rather than candidate cases and in fact indicated that the case might be different in the voter situation. *Bendinger*, however, was a candidate case and the Court had no real opportunity to adequately consider the "raiding" implications in voter cases. This Court on the other hand has had ample opportunity to consider all the evidence and to hear oral argument on this precise issue and I find that the State's prevention of "raiding" is as compelling an interest in voter cases as it is in candidate cases and that the State has met all of the requirements of the "compelling interest" test as set out above. (See also Gunderson v. Ghent, et al., 69 C. 43 (W.D.Ill. Slip Op. February 2, 1970) which also upheld the statute regarding candidates on the grounds that "it reflects a State policy to foster and lend stability to party structure and political organization".)

In Lippitt v. Cipollone, 337 F.Supp. 1405 (N.D. Ohio, 1971) the Court also considered a statute regulating candidacy based on party affiliation. The Court said:

"The compelling State interests the Ohio Legislature seeks to protect by its contested statutes is the integrity of all political parties and membership therein. These Ohio statutes seek to prevent 'raiding' of one party by members of another party and to preclude candidates from' . . . alter-

ing their political party affiliations for opportunistic reasons.' State ex rel Bible v. Board of Elections, 22 O. S.2d 57, 258 N.E.2d 227 (1970). Protection of party membership uniformly applied to all parties cannot be characterized as 'invidious discrimination' as defined in *Williams*. The United States Supreme Court has recognized the need to 'protect a party from intrusion by those with adverse political principles' to be a legitimate purpose for said legislature. Ray v. Blair, 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952)."

The requirement of the challenged statutes insuring party integrity and party political affiliation, together with the exemptions enacted to aid emerging political parties, are simple, reasonable, and uniform procedures designed to accomplish the desired result."

The U. S. Supreme Court in Lippitt v. Cipollone, 404 U.S. 1032, 92 S.Ct. 729, 30 L.Ed.2d 725 (1972) in affirming the lower Court decision without opinion implicitly conceded the possibility of raiding and recognized its prevention as being a valid State interest. Preventing raiding is a valid compelling interest of the State and is as applicable, I believe, in voter cases as it is in candidate cases.

Juxtaposing this compelling interest of the State against the temporary deprivation of the plaintiffs' right to vote in this particular primary and considering the fact plaintiffs' are not deprived of their right to vote since they are perfectly free to vote in the primary of the party for which they voted in the February 1971 primary, I find no basis for overturning these statutes.

While the majority finds that "[t]here is no evidence to indicate that raiding is more likely to take place than 'honest' switches of affiliation" and "that raiding is not a serious threat to the multi-party system" (Majority Opinion, p. 1108) I am compelled by the evidence and Illinois political circumstance to believe that such a threat is a very real and imminent one absent the stat-

ute in question and not merely one in the realm of the hypothetical or speculative. Thus my application of the compelling interest test to the present situation produces a different result than that of the majority based on the single, critical factor of the substantiality and probability of inter-party raiding.

We might note here that the result in *Rosario, supra* was the invalidation of a procedure that was also designed to prevent raiding. In that case however the "enrollment box" procedure failed to meet the "compelling interest" test because it was not the least drastic measure available to accomplish the objective sought and it was not proven that the system was necessary for its accomplishment. The Court did not however discount the possibility of raiding but determined that there was a less invidious method of preventing it. I, however, believe that the sweep of the 23-month rule is narrow enough to conform with the least invidious and compelling interest test.

Furthermore I do not believe that the contrary decision of Gordon v. Executive Committee of the Democratic Party of Charleston, 335 F.Supp. 166 (D.S.C. 1971) forecloses my opposite finding. The statute in that case also prevented a citizen from voting in the primary of another party and the Court invalidated it on the grounds that it was arbitrary and was not justified by a compelling State interest. What must be understood is that the "compelling interest" test is of an acutely subjective nature and given the fact that political climates are as variable as geographic climates a State interest that might be less than compelling to a Judicial panel in one locale may take on compelling proportions to a panel in a different district.

I need not elaborate on the constitutionality of the Section 7–43(a) and Section 7–44 regarding the declaration of party affiliation since defendants themselves admit that it is the means by which the 23-month restriction is enforced. Having found that the 23-month rule is constitutional we likewise

find that the same compelling State interest of "raiding" justifies the declaration of party affiliation and that it does not violate the First and Fourteenth Amendments, or the Voting Rights Acts. In addition the majority, which has found the twenty-three month rule unconstitutional has nevertheless upheld the declaration of party affiliation portion of the statute on the grounds that the infringement on the voter is minimal and that "whatever burden is suffered is outweighed by the state's 'compelling' interest in preventing election fraud", and that furthermore it is also necessary "to buttress the requirement that voters participate in only one party's primary at a time". (See Majority Opinion at p. 1109.) Thus even if we were not to consider raiding a threat we would nevertheless be bound to find the declaration portion of the statute constitutional based on the majority's reasons.

To summarize, then, in applying the current compelling interest test as designed for voting rights cases I have found that both the 23-month rule and the declaration of party affiliation is fully justified by the interest of the State in preventing the inter-party raiding that would result absent these restrictions; that the infringement of the plaintiffs' rights is minimal given its temporary nature and the existence of alternate electoral avenues; and that these are the least drastic measures available.

In finding so I need not base my decision solely on the grounds that the preservation of party integrity and the multi-party system is a proper state interest as *Bendinger, Gunderson* and Lippitt v. Cipollone do indeed indicate. The argument that this Court ought not be instrumental in preserving those artificial procedures and extra-constitutional encumbrances, such as party politics, that have been engrafted wisely or unwisely by historical development upon the purity of the American electoral process might be a more valid one were we being asked to take the initiative in instituting such procedures where they did not before exist. Thus if political parties as such and their accompanying procedures were nonexistent it might be validly posited that it is beyond the province of this Court to lend assistance in their creation. This, however, is not a case where we are being asked by the State for a declaratory judgment or injunctive relief that would create or put into effect party system rules such as the 23-month or party affiliation regulations. Rather our task has been to analyse and weigh, with the prescribed constitutional criteria, an already existing law that the legislature in its considered judgment has determined to be the best method available for the preservation of that electoral purity that both sides in this case so earnestly desire. It is far beyond the role intended for this Court to adopt the posture of a microcosmic legislature that would design better methods of preserving electoral purity where an adequate statute that meets the compelling interest test has already been promulgated by the state legislature. In attempting to preserve that purity as embodied and manifested in the statutes under attack it would be remiss of this Court not to take judicial notice of the inescapable fact that parties and party lines do indeed exist and that they are inseparable elements of the electoral scene. We would be equally remiss if we were not cognizant of the fact that party allegiances are powerful and can quite easily lead to nefarious inter-party raiding absent any restrictions. [See Dreiske, GOP Primary Ploy, Chicago Sun-Times, March 1, 1972, p. 40 which indicates that Republicans are being urged on a large scale to cross over into the Democratic Primary on March 21, 1972 since there are no real contests in the Republican Primary. The article indicates that an even greater crossover would take place were it not for the twenty-three month rule.] The adoption of such a position when reality so compels and the circumstances so dictate does not mean that I take a more jaundiced or more untrusting view of the

voting public than does the majority but rather indicates that I believe the phenomenum of raiding to be an inescapable outgrowth of the competitiveness engendered by the multi-party system and that that competitiveness ought not go so far as to inject any impurities or fraud into the electoral process as it manifests itself on general election day. My determination, then, that the statute is not unconstitutional is as much motivated by my desire to preserve the multi-party system as it is to prevent the shambles that could conceivably result in the general elections, irrespective of party considerations, absent any prophylactic measure to prevent raiding.

I would therefore find Sections 7–43 and 7–44 constitutional and dismiss the Plaintiff's case. Being in the minority I must be contented with a vigorous dissent.